**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION**

| | | |
|---|---|---|
| JOHN KYLE SWEENEY, et. al. | : | 2:19-cv-46-WOB-CJS |
| v. | : | |
| JUSTIN CRIGLER, et. al. | : | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER WITH DECLARATIONS OF CRISTI KENDRICK AND JOHN HICKS IN SUPPORT**

## I. INTRODUCTION

Plaintiffs, by and through Counsel, seek an emergency preliminary injunction and/or temporary restraining order, against enforcement of changes to the filing deadline of the statement of candidacy in 2019 House Bill 114 and Senate Bill 60 (both of which amended K.R.S. 118.367), to the last Tuesday in January preceding the regular election, and particularly to 2019 HB 114, which did so retroactively for the 2019 election cycle. Plaintiffs will address other issues in a motion for summary judgment.

## II. BASIS FOR REQUEST FOR EMERGENCY RELIEF

In House Bill 114, the General Assembly retroactively changed the filing deadline for the statement of candidacy, including the provision of an emergency clause that caused it to take immediate effect. *See, also*, Exhibit C, HB114. Plaintiffs John Hicks, Ann Cormican, Kyle Hugenberg, and Josh Gilpin were duly nominated for office for the 2019 election cycle. (Declaration of Cristi Kendrick). None of them can currently appear on the ballot due to the fact that the filing deadline for their statement of candidacy deadline was retroactively changed. (Declaration Hicks).

There is currently a deadline for the filing of the certificates of nomination for these candidates, **of June 4, 2019**. See, also, KRS 118.365. The Secretary of State's office has made clear that it will not accept or process these certificates of nomination, absent a court order. See, also, Hicks Declaration, at Exhibit B, Exhibit 1 thereto, Letter.

*<u>At a minimum, this Court should immediately issue a status quo order that requires the Secretary of State and Boone County officials to accept (but not process) the statement of candidacy filings and nominating petition filings of Plaintiffs, while this matter is fully briefed and argued. We suggested an agreed order to this effect to Counsel for the Secretary, but at this point, she has declined to agree to such a measure. That, in turn, makes the June 4, 2019 deadline particularly important, and creates an emergency.</u>*

### III. FACTS

1. <u>Background of Kentucky's Ballot Access Laws</u>

Kentucky law does not permit "general" ballot access for a political party unless that party receives over 2% of the vote in a Presidential race. K.R.S. 118.015, K.R.S. 118.305(1)(e), and K.R.S 118.305. If a political party's candidate receives over that percentage vote, that party may nominate its candidates, and place them on the general election ballot, for a period of four years, with no further steps insofar as the Commonwealth of Kentucky is concerned. *Id.* There is no other way for a political party to receive blanket ballot access – even if they run candidates in other statewide races. *Id.*

Kentucky utilizes a three-tiered system for political groups and ballot access. At the top of the tier are "Political Parties." They are defined in K.R.S. 118.015(1) as follows: "A 'political party' is an affiliation or organization of electors representing a political policy and having a constituted authority for its government and regulation, and whose candidate received at least

twenty percent (20%) of the total vote cast at the last preceding election at which presidential electors were voted for."

Next are "Political Organizations." They are defined in K.R.S. 118.015(8) as follows: "'Political organization' means a political group not constituting a political party within the meaning of subsection (1) of this section but whose candidate received two percent (2%) or more of the vote of the state at the last preceding election for presidential electors."

Finally, there are "Political Groups." They are defined in K.R.S. 118.015(9) as follows: "'Political group' means a political group not constituting a political party or a political organization within the meaning of subsections (1) and (8) of this section."

Pursuant to K.R.S. 118.305(1)(a), (b), (c), and (d), candidates for Political Parties and Political Organizations automatically earn ballot access, and do so for a four-year period following the presidential election. They place their candidates on the ballot, through a certificate of nomination process, as defined in K.R.S. 118.325(1), (2), and (3), K.R.S. 116.265, and K.R.S. 118.356. A statement of candidacy for state and local partisan offices (but not federal offices) is also required to be filed under K.R.S. 118.325(3), K.R.S. 118.365(5), K.R.S. 118.367. The deadline for that statement is what is at issue in this case.

2. Background on the Plaintiffs in this matter

Plaintiffs in this case include the four 2019 Libertarian candidates for statewide office who have been nominated by the party: John Hicks, candidate for Governor, Ann Cormican, candidate for Lt. Governor, Kyle Hugenberg, candidate for State Auditor, and Josh Gilpin, candidate for Agriculture Commissioner. (Declaration Kendrick, Exhibit A; Declaration Hicks, Exhibit B).

The other Plaintiffs are Kyle Sweeney, candidate for Boone County Clerk (filling a vacancy), Cristi Kendrick, who will be a candidate in 2020 and/or 2022, and the Libertarian Party of Kentucky. (Declaration, Kendrick, Exhibit A).

3. The 2019 Electoral Activities of the Libertarian Party of Kentucky

In order to nominate its candidates, LPKY must hold conventions under K.R.S. 118.325. There are approximately 12,000 registered Libertarian voters in Kentucky. (Declaration, Kendrick, Exhibit A). LPKY undertakes its convention planning process well in advance of the conventions. *Id.* It does so for several reasons: (i) first, to give reasonable notice to registered Kentucky Libertarian voters of the convention and their ability to participate in the convention process; (ii) second, to book and place reservations for appropriate venues to hold these conventions, which are invariably paid for out of members dues; and (iii) to give reasonable notice to candidates thinking about running for public office, so that they have sufficient time to explore their candidacies, and to engage in campaigns directed towards Libertarian voters. *Id.*

And so it was with the 2018 and 2019 conventions. *Id.* Those conventions were held at both the Congressional District level, sometimes the county level, and always the state level. *Id.* In 2019, Libertarians in Kentucky traveled to Paducah, Kentucky, at their own cost, and stayed overnight in hotel accommodations (unless they lived in Western Kentucky) at their own cost, all to exercise the right to vote for their candidates for state office. *Id.* These out of pocket costs to Libertarian voters, as well as costs to the party, exceeded $15,000 in 2019. *Id.*

Since achieving ballot access in 2016, LPKY ran approximately 20 candidates, mostly at the county level, but also ran several candidates for the Kentucky State House of Representatives, and two candidates for Congress. *Id.*

4

LPKY, and its candidates, achieved some success – particularly where the party was able to target races where: (i) there was serious dissatisfaction with incumbent candidates or weak or flawed candidates put forward by Democrats or Republicans; or (ii) in races where Democrats or Republicans did not file for the office in question. *Id.* The party has elected several Magistrates/Justices of the Peace, in approximately five separate counties, as a result of that strategy in 2018. *Id.*

LPKY reasonably relied on Kentucky law in formulating its nominating processes, holding its state convention in 2019 in early March, well aware of the April 1 filing deadline prior to 2019 HB 114, as mentioned, at significant burden and expense to the party and its members. *Id.*

In addition to Presidential races, LPKY has also fielded candidates for Congress and U.S. Senate. *Id.* Those races do not require a statement of candidacy. *Id.*

The statement of candidacy deadline and requirement has nothing to do with preventing overcrowding of the ballot – this is evidenced by the fact that such statements are not required for federal office in Kentucky. *Id.*

The challenged provisions impermissibly freezes the status quo and does not allow for a real and equal opportunity for ballot qualification. *Id.*

LPKY, and independent candidates and third-party candidates almost always come from dissatisfaction with incumbent candidates. *Id.* A January deadline impermissibly freezes the election field at a time when campaigns for the major-party nominations have only begun, and the major parties will not adopt their nominees and platforms for another five months. Candidates and supporters within the major parties thus have the political advantage of continued flexibility; but for independents and third parties, the inflexibility imposed by the January filing

deadline is a correlative disadvantage because of the competitive nature of the electoral process. *Id.*

    4.  <u>The General Assembly pulled the rug out from under Plaintiffs</u>

In HB114, the General Assembly initially proposed legislation that modified the statement of candidacy deadline from April 1, to the last Tuesday in January.[1] As introduced, the bill did not contain an emergency clause, and so, presumably, it would not have effected the 2019 election cycle. On March 6, 2019, a Senate Committee substitute was introduced, that made the deadline retroactive with an emergency clause, and contained various significant changes to the Kentucky Secretary of State's powers.[2]

At the same time, the Kentucky Senate pursued Kentucky Senate Bill 60, which likewise made only the change to the statement of candidacy deadline in K.R.S. 118.367.

Certified copies of 2019 HB 114 and 2019 SB 60 are likewise attached.

## IV. LAW AND ARGUMENT

### A. Standard for Granting Temporary Restraining Orders and Preliminary Injunctions

When deciding whether to issue a temporary restraining order or preliminary injunction, the court must consider the following four factors:

(1) Whether the movant has demonstrated a strong likelihood of success on the merits;

(2) Whether the movant would suffer irreparable harm;

---

[1] See, also, https://apps.legislature.ky.gov/recorddocuments/bill/19RS/hb114/orig_bill.pdf (last visited 5/6/2019)

[2] https://apps.legislature.ky.gov/record/19rs/hb114.html (last visited 5/6/2019).

6

(3) Whether issuance would cause substantial harm to others; and

(4) Whether the public interest would be served by issuance.

*Suster v. Marshall*, 149 F.3d 523, 528 (6th Cir. 1998); *Northeast Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). These "are factors to be balanced, not prerequisites that must be met." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

When analyzing a motion for temporary restraining order or preliminary injunction, "the 'likelihood of success' prong is the most important [factor] and often determinative in First Amendment cases." *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009); *see also Aristotle Pub. v. Brown*, 61 F. App'x 186, 188 (6th Cir. 2003). The standards for preliminary injunctions and permanent injunctions are essentially the same with the exception that for a permanent injunction the plaintiff must show actual success on the merits rather than the likelihood of success. *ACLU of Ky. v. McCreary County, Ky.*, 607 F.3d 439, 445 (6th Cir. 2010).

Finally, on the merits, it is the Defendants, not Plaintiffs, that bear the burden of establishing the constitutionality of the challenged legislation, since First Amendment rights are at issue. *U.S. v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 816 (2000).

### B. Kentucky's 2019 HB114 violates Due Process due to unconstitutional retroactivity

As noted, 2019 HB 114 retroactively changed the filing deadline in the middle of the 2019 election cycle, from April 1, to the last Tuesday in January. As a result, the Secretary of State's Office has refused to process statement of candidacy filings from a number of the Plaintiffs (and Boone County has done the same with respect to Mr. Sweeney). See, also, Declaration Hicks, at Letter Exhibit.

7

The unconstitutional retroactivity of 2019 HB 114, applied to the 2019 election cycle, which pulled the rug out from under Plaintiffs, is clearly unconstitutional under well-established case law. First, is *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 208 (1988). In that case, the Supreme Court addressed a retroactive rulemaking challenge. In that case, the Supreme Court noted that "[r]etroactivity is not favored in the law." *Id.*

In *Ea. Enters. v. Apfel*, 524 U.S. 498, 532-33 (1998), the Supreme Court observed that "legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience." Id. at 529-530.

The court further observed that "'[r]etroactive legislation,' we have explained, 'presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions.'" *Id.* at 533.

A much more recent case is *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012). In that case the Supreme Court addressed the issue of a retroactive interpretation and application of a nudity-on-television regulation and statute. The Court found a due process problem with this approach, finding it incomprehensible that persons would face liability retroactively. Id. at 253-259.

Courts, in this Circuit and elsewhere, have addressed due process issues with retroactively changing filing deadlines, such as what happened in the present case. First, *Hudler v. Austin*, 419 F. Supp. 1002 (E.D. Mich. 1976), the Court dealt with legislation that moved up compliance deadlines. In striking the challenged law in the present election cycle, the Court observed that "its late April, 1976, effective date comes so close to the August 3, 1976, primary as to have deprived plaintiffs of due process by giving them so little time to marshal their

8

supporters, publicize the necessity of primary voting and depriving them of the opportunity they would have had for proselytizing while they were getting their petitions filled earlier in the year." *Id.* at 1013. Thus, "[t]he passage of Act 94 late in April caught plaintiffs at a particularly prejudicial and inopportune time to begin attempting to comply with the new requirements." *Id.*

Here, of course, and even worse than the law struck down in *Hudler*: the passage of 2019 HB 114 provided Plaintiffs with no opportunity whatsoever to comply with the new January deadline – the law required a filing by April 1, and Plaintiffs adjusted their entire electoral apparatus, including convention scheduling, to meet that deadline. Then, as noted, the General Assembly moved the goalposts when the ball was already in the air.

Second, is *Libertarian Party of Ohio v. Husted*, 2014 U.S. Dist. LEXIS 187771 (ED Ohio 2014). There, as here, the mid-election-cycle changes to deadlines and requirements violated due process. Again, in some ways, *Husted* was less egregious than the present case, in that it was still possible to meet the deadline in *Husted*. Here, 2019 HB114 literally took away the ability of these Plaintiffs to timely file statements of candidacy.

At least one cases from another circuit is in agreement with the unconstitutionality of retroactively setting deadlines. *Campbell v. Bennett*, 212 F. Supp. 2d 1339 (Al. MD 2002) (retroactive filing deadline unconstitutional).

As noted below, the deadline itself is unconstitutionally early. However, retroactively changing the deadline, in the middle of an election cycle, violates fundamental due process. At a minimum, the 2019 candidate filings by Plaintiffs should be processed and they should be placed on the ballot.

### C. The January statement of candidacy deadline in 2019 HB 114 and 2019 SB 60 violates the First and Fourteenth Amendments

9

The First Amendment of the U.S. Constitution provides, in relevant part, that "Congress shall make no law ... abridging the freedom of speech..."  The First Amendment has been incorporated under the Fourteenth Amendment to apply to the states, including the Commonwealth of Kentucky, under *Gitlow v. New York*, 268 U.S. 652 (1925).  The First Amendment likewise contains a guarantee of the freedom to associate.  *National Association for the Advancement of Colored People v. Alabama*, 357 U.S. 449 (1958).  The Fourteenth Amendment likewise contains guarantees of liberty and equal protection.

    1.  <u>Res Judicata and/or Collateral Estoppel requires a finding of unconstitutionality here</u>

In 1991, the Libertarian Party of Kentucky, one of the Plaintiffs herein, sued the Kentucky Secretary of State, Bremer Ehler, in this Court, due to an early filing deadline.  See, also, *Libertarian Party of Kentucky v. Ehrler*, 776 F. Supp. 1200 (EDKY 1991), case no. 91-231.  In that case, the filing deadline was January 29.  *Id.* at 1203.

Under 2019 HB 114 and 2019 SB 60, the filing deadline is the last Tuesday in January, which also was January 29 of this year.

A claim is barred by the res judicata effect of prior litigation if all of the following elements are present: (1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their "privies"; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action.  *Browning v. Levy*, 283 F.3d 761, 771-772 (6th Cir. 2002).

The decision in *Ehrler* involved a final decision on the merits by a court of competent jurisdiction – specifically this Court.  This action is between the same parties (the Libertarian Party of Kentucky and the Kentucky Secretary of State).  The filing deadline issue is the same.  And the causes of action are, with the exception of the due process issue above, the same.  More

specifically, the First and Fourteenth Amendment filing deadline issues are the same. Res judicata thus establishes the unconstitutionality of the January filing deadlines in 2019 HB 114 and 2019 SB 60.

Collateral estoppel applies where: 1) the identity of the parties across the proceedings does not change, 2) the first proceeding resulted in a valid, final judgment, 3) the same issue was litigated and determined in the first proceeding, and 4) the party arguing against collateral estoppel had a full and fair opportunity to litigate the issue(s) in question at the first proceeding. *Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir.2001).

Again, the identity of the parties did not change (Secretary Grimes, in her official capacity, is substituted for Secretary Ehrler). There was a final, valid judgment. The same issues were litigated. And there was fully and fair opportunity to litigate the issues in *Ehlrer*. Thus, collateral estoppel also establishes the unconstitutionality of 2019 HB 114 and 2019 SB 60.

    2. <u>The January deadline is unconstitutionally early</u>

Even if res judicata and collateral estoppel do not foreclose the ability of Defendants to defend this matter, the deadlines in 2019 HB 114 and 2019 SB 60 are unconstitutional.

Incidentally, the analysis is the same whether brought as a pure First Amendment Challenge, or an Equal Protection challenge, or both. *Obama for Am. v. Husted*, 697 F.3d 423, 430 (6th Cir. 2012).

First, "the right of individuals to associate in political organizations, and the right of citizens to cast a meaningful vote, are among the most important values in our democracy." *Id.* at 545, *citing Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 586 (6th Cir. 2006) and *Williams v. Rhodes*, 393 U.S. 23, 30, 89 S. Ct. 5, 21 L. Ed. 2d 24 (1968). Furthermore,

11

"[a]ssociational rights and voting rights are closely connected, since 'the right to form a party for the advancement of political goals means little if a party can be kept off the election ballot.'" *Id.* But, "states may impose reasonable restrictions on ballot access to ensure that political candidates can show a 'significant modicum of support' from the public," *Id. citing Jenness v. Fortson*, 403 U.S. 431, 442 (1971), "and to avoid 'election- and campaign-related disorder,'" *Id. citing Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S. Ct. 1364, 137 L. Ed. 2d 589 (1997). As such, "State restrictions on ballot access therefore 'are not automatically subjected to heightened scrutiny.'" *Id.*

In *Williams v. Rhodes*, 393 U.S. 23, the U.S. Supreme Court addressed Ohio's ballot access regime. In that case, the State of Ohio required a new political *party* to submit a petition with a number of signatures equal to 15% of the votes cast in the last gubernatorial campaign. *Id.* at 25. The major parties, to remain on the ballot, needed to obtain votes equal to 10% of the last gubernatorial campaign. *Id.* And, "Ohio laws make no provision for ballot position for independent candidates as distinguished from political parties." *Id.* The *Williams* Court was clear that "[n]o extended discussion is required to establish that the Ohio laws before us give the two old, established parties a decided advantage over any new parties struggling for existence and thus place substantially unequal burdens on both the right to vote and the right to associate." *Id.* at 31.

*Williams* was likewise clear that "[t]he right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes." *Id.* "So also, the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot." *Id.* "In determining whether the State has power to place such unequal burdens on

12

minority groups where rights of this kind are at stake, the decisions of this Court have consistently held that 'only a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms.'" *Id.*

Finding the laws unconstitutional, the Supreme Court in *Williams* directed the placement of the challenging political parties on the ballot, to the extent the state's election machinery (i.e. printing of the ballots) was not compromised. *Id.* at 34.

Turning then to *Storer v. Brown*, 415 U.S. 724, 728 (1974), the U.S. Supreme Court observed that the "State must also provide feasible means for other political parties and other candidates to appear on the general election ballot." Furthermore, "past experience [of electoral success] will be a helpful if not always an unerring guide." *Id.* at 742. Moreover, "the political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other." *Id.* at 745. As such, "the State must provide a feasible opportunity for new political organizations and their candidates to appear on the ballot." *Id.* at 746.

The U.S. Supreme Court articulated the contemporary standard for evaluating constitutional challenges to a state's election laws in *Anderson v. Celebrezze*, 460 U.S. 780, 788-89, 103 S. Ct. 1564, 75 L. Ed. 2d 547 (1983), and again in *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S. Ct. 2059, 119 L. Ed. 2d 245 (1992). "First, the court must 'consider the character and magnitude of' the plaintiff's alleged injury." *Id.* Next, it "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id*. Finally, it must assess the "legitimacy and strength of each of those interests," as well as the "extent to which those interests make it necessary to burden the plaintiff's rights." *Id*.

Again, in *Ehrler*, 776 F. Supp. 1200 the LPKY has previously litigated the exact questions raised here – an early statement of candidacy deadline. This Court, in *Ehrler*, addressed a January 29 filing deadline. *Id.* at 1203. The Court struck the January 29 filing deadline, first cited *Williams v. Rhodes*, 393 U.S. 23 (1968), which struck an early February filing deadline for statement of candidacy forms in Ohio as too early.

It also cited *Anderson v. Celebreeze*, 460 U.S. 780 (1983), which struck a March filing deadline for statement of candidacy forms in Ohio as too early. And it cited *Cripps v. Seneca County Board of Elections*, 629 F. Supp. 1335 (N.D. Ohio 1985), which struck a late February filing deadline as too early, and *New Alliance Party of Alabama v. Hand*, 933 F.2d 1568 (11th Cir. 1991), which rejected an April 6 deadline as too early.

In discussing the early March deadline in *Anderson*, the U.S. Supreme Court opined that "[a]t this point developments in campaigns for the major-party nominations have only begun, and the major parties will not adopt their nominees and platforms for another five months. Candidates and supporters within the major parties thus have the political advantage of continued flexibility; for independents, the inflexibility imposed by the March filing deadline is a correlative disadvantage because of the competitive nature of the electoral process." 460 U.S. 780 at 791. Furthermore, "[i]f the State's filing deadline were later in the year, a newly emergent independent candidate could serve as the focal point for a grouping of Ohio voters who decide, after mid-March, that they are dissatisfied with the choices within the two major parties." *Id.*

As Ms. Kendrick's declaration explains, those same issues were particularly at issue in her decision as to whether and what to file for in 2020 and/or 2022. (Declaration, Kendrick). And as Mr. Hicks explains in his declaration, his decision to run for State Representative and then Governor, were made well after January – which is always the case with smaller political

parties. (Declaration, Hicks). As the Supreme Court noted, "a newly emergent independent [or third party] candidate could serve as the focal point for a grouping of [Kentucky' voters who decide, after mid-March, that they are dissatisfied with the choices within the two major parties." *Anderson*, 460 U.S. 780 at 791.

Early filing deadlines are highly scrutinized by Courts. And the Sixth Circuit is no exception. In Libertarian Party of Ohio v. Blackwell, 462 F.3d 579 (6th Cir. 2006), the Sixth Circuit noted that it was appropriate to apply strict scrutiny to such early filing deadlines. In *Blackwell*, the Sixth Circuit cited to *New Alliance Party of Ala. v. Hand*, 933 F.2d 1568, 1576 (11th Cir. 1991), where that Court observed that "[n]o one can seriously contend that a deadline for filing for a minor party and its candidates seven months prior to the [general] election is required to advance legitimate state interests."

Here, of course, a January filing deadline for the statement of candidacy is 10 months – not merely 7 months – before the general election. It is also 112 days before the primary election in Kentucky. As the Sixth Circuit observed in Blackwell, "[Kentucky's deadline] is [approximately] 120 days in advance of the primary election … This deadline imposes a severe burden on the First Amendment rights of the LP[KY]." *Id.* at 591.

Typically, the state will assert its interests in avoiding ballot overcrowding, or processing issues with candidate filings. But here, neither of those interests are meaningfully advanced. There is no requirement for a statement of candidacy for federal candidates. The statement of candidacy filing is merely a placeholder. Kentucky regulates ballot overcrowding through its three-tiered system, requiring a fairly onerous petition and signature gathering effort for independent candidates and very small political groups. Kentucky then underwrites and publicly

15

funds the primary and nomination process for Political Parties – the Democratic and Republican parties.

In the middle, between these groups, is the only Political Organization in Kentucky at present – the Libertarian Party. The party has demonstrated a modicum of support, since its Presidential Candidate in 2016 achieved over 2% of the popular vote. And the filing of the statement of candidacy does nothing to place a candidate on the ballot.

As noted, that process occurs with the certificate of nomination, which is due to be filed in June.

There is no valid state interest with this early deadline. One can only surmise two possible reasons that anyone may have with moving the deadline back to January – none of which are valid state interests: (1) it lets incumbent state (but not federal) candidates know they will be challenged earlier so they can either start fundraising earlier, or so they can "behave" in office; and (2) it insulates state incumbents from challenges and electoral accountability before the General Assembly meets in earnest in election years. Either, or both, of these interests may be the interests of incumbent candidates, but do not further the interests of the people of Kentucky.

In the alternative, if the Court finds that Kentucky's ballot access provisions, facially and as applied to Plaintiffs, do not constitute a severe burden on the rights of the Plaintiffs, then they constitute more than a minimal burden, and do not pass muster under the flexible analysis that weights the burdens of Plaintiffs against the Commonwealth's asserted interest and chosen means of asserting it, under the prevailing U.S. Supreme Court cases of *Anderson v. Celebrezze*, 460 U.S. 760 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992).

**D. Irreparable Harm**

"[T]o the extent that [the moving party] can establish a likelihood of success on the merits of its First Amendment claim, it also has established the possibility of irreparable harm as a result of the deprivation of the claimed free speech rights." *Connection Dist. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (*quoting Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)). After all, the United States Supreme Court has repeatedly recognized, "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Id.* (*quoting Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)).  The same is true of Equal Protection.  *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("Courts have also held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights.").  Having demonstrated likelihood of success, Plaintiffs have likewise demonstrated irreparable harm from the enforcement of the unconstitutional statutes – either facially – or as applied.

### E.  Harm to Others

There is no harm to others that is implicated if the state and local officials must obey the Constitution.  *Mich. Chamber of Commerce v. Land*, 725 F. Supp. 2d 665 (E.D. Mich. 2010).  *See, also, Foster v. Dilger*, 2010 U.S. Dist. LEXIS 95195 (EDKY 2010) (no substantial harm to others, even where registry incurred printing costs, where constitutional rights at stake); *ACLU v. McCreary County*, 96 F. Supp. 2d 679 (ED KY 2000) (no substantial harm to others).

### F.  Public Interest

As for the fourth factor, the public interest always strongly favors the vindication of constitutional rights and the invalidation of any state action, which infringes on those rights or chills their confident and unfettered exercise.  *Mich. Chamber of Commerce v. Land*, 725 F.

Supp. 2d 665 (E.D. Mich. 2010). "It is in the public interest not to perpetuate the unconstitutional application of a statute." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982); *see also G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1999) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

## V. CONCLUSION

Plaintiffs have demonstrated their entitlement to a temporary restraining order or preliminary injunction. At a minimum, Plaintiffs have established cause for the immediate setting of a hearing to determine the merits of this matter, and/or a *status quo* order to Defendants to accept (but not process) the nominating petitions of Plaintiffs and/or their candidates, pending a ruling on the merits of this matter.

Respectfully submitted,

/s/ Christopher Wiest_____
Christopher Wiest (KBA 90725)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
859/486-6850 (v)
513/257-1895 (c)
859/495-0803 (f)
chris@cwiestlaw.com

/s/Thomas Bruns_____
Thomas Bruns (KBA 84985)
4750 Ashwood Drive, STE 200
Cincinnati, OH 45241
tbruns@bcvalaw.com
513-312-9890

/s/Robert A. Winter, Jr. _____
Robert A. Winter, Jr. (KBA #78230)
P.O. Box 175883
Fort Mitchell, KY 41017-5883
(859) 250-3337

18

        robertawinterjr@gmail.com

        **Attorney for Plaintiffs**

## CERTIFICATE OF SERVICE

I certify that I have sent a copy of the foregoing to all counsel of record via filing in the Court's CM/ECF system, which provides notice and service of same to each party of record, this  6   day of May, 2019, and have further sent a copy of same to Hon. Jennifer Scutchfield by electronic mail, who contacted the undersigned and indicated she represented the State Board of Elections Defendants.

        /s/ Christopher Wiest_____
        Christopher Wiest (KBA 90725)